Mr. Sternberg. Thank you, Your Honor. May it please the Court. I'm Jonathan Sternberg and I represent the appellants, Dante Combs and Adam Williams. Mr. Combs and Mr. Williams appeal from the District Court's summary judgment on their Section 1981 contract discrimination claims. Summary judgment was error and should be reversed. My clients, two African-American gentlemen, brought Section 1981 claims against the Cornish companies who developed the Power and Light Entertainment District here in downtown Kansas City, Entertainment Concepts, or ECI as we call them, a collection of Cornish entities, subsidiaries, who runs the district day-to-day, Lounge KC, who runs Mosaic, one of the establishments inside the district, and First Response, the district's security provider, in 2011. My clients alleged, and the evidence viewed in a light most favorably to them showed, that in three incidents, one in 2010 and the other two in the summer of 2011, they were victims of a pervasive segregationist scheme to prevent African-American men from patronizing the establishments in the district, specifically in the Cornish and ECI-controlled live block building, through the use of various pretextual strategies. The scheme was orchestrated by Cornish and ECI and was carried out on their orders by the other defendants. The District Court, however, granted all the defendants' summary judgment, holding, first, that Mr. Combs was judicially estopped from bringing his claims due to his failure to list them as assets in a prior Chapter VII bankruptcy, and second, that except for Mr. Combs' claims against Lounge KC, all of the plaintiffs' other claims failed on the merits under Section 1981. Both of these rationales were error, and the Court should reverse the District Court's summary judgment and remand for further proceedings. And I'd like to begin with the judicial estoppel holding. The law of the United States is and must be that judicial estoppel was inapplicable under these circumstances, because these circumstances do not and cannot fit either the Supreme Court's three New Hampshire factors or the manner in which this Court has ever applied judicial estoppel, especially in the bankruptcy context. First, the law both in this Circuit and in the Tenth Circuit, and I think that's kind of crucial, where Mr. Combs' Chapter VII bankruptcy was, is that his claims against the defendants, which arose post-petition, the two 2011 incidents were post-petition, were not assets as a matter of law that he had to list in that bankruptcy. As a result, and as this Court held in the Stallings case in 2006, the first New Hampshire factor, clear inconsistency between two positions, was missing, and judicial estoppel fails outright. What was his obligation to, if any, to amend the Tenth Circuit? That's an excellent question, Your Honor. The answer to that is twofold. Statutorily, he had no such duty. 11 U.S.C. Section 541A1 says that all he has the duty to list is what he had as of the commencement of the case. That's the phrase the statute uses. Second, in the Vehicle Market Research case, which is the Tenth Circuit in 2014, they held expressly that when you have an asset that can switch valuations or something like that, that there is no duty to amend. I mean, the way I read the statute, and the way I think the Tenth Circuit read the statute in the Vehicle Market Research case, is let's say, you wouldn't find this ever arises, but let's say that after filing your Chapter VII bankruptcy, you win the lottery. You wouldn't really have a duty to amend, because that's not something you held as of the commencement of the case. Now, of course, in a normal circumstance, somebody who wins the lottery would dismiss their bankruptcy. But what, how do we compare that with Chapter XIII? It seems that some of the case law is more often addressing the Chapter XIII obligations, and how do we square that? Certainly. First of all, Section 541 applies to Chapter VII. That doesn't apply to Chapter XIV. That's in the chapter about what's in Chapter VII of the Bankruptcy Code. The cases we rely on are principally not Chapter XIII cases. The cases the other side relies on, and in our reply brief, we go through every single one of them in great detail, explaining that every single case they rely on is either a Chapter XIII case, or is a case in which the alleged claim arose pre-petition. Our cases, principally the Ockwin case from the Ninth Circuit in 2013, the Spain case from the Seventh Circuit in 2014, those are Chapter VII cases. And, for example, the Stallings case in this court in 2006, that's also a Chapter VII case. The difference, of course, between Chapter VII and Chapter XIII is Chapter VII is a liquidation, Chapter XIII is a reorganization. While the plan period is still ongoing, I agree with the defendants that if there were a Chapter XIII bankruptcy, as in the Jones case that this court decided just this year, if this were a Chapter XIII, yes, there would be a duty to amend. But there isn't in a Chapter VII, because... Even if it's connected in some way to, because I'm trying to conceptualize the connection between the pre-petition claim and the two post-petition claims that are all brought in the same lawsuit. To be clear, Your Honor, my client, Mr. Combs, that is, Mr. Combs has no pre-petition claim. The one incident, the Makers incident, that occurred in 2010, is for Mr. Williams, not for Mr. Combs. But he initially was a plaintiff in that one, was he not? The allegations in the complaint were as to all the incidents together with both plaintiffs, I agree. We agree with the defendants, as we also agreed about first response not being liable for that claim either, that Mr. Combs has no claim as to the Makers incident. He was not thrown out of the district. He was not thrown out of the establishment. That's only as to Mr. Williams. So what we're really dealing with are these two claims, the Tango incident and the Mosaic incident, which occurred post-petition. Now, one of the defendants' first response tries to suggest, viewing the evidence in the light most favorable to them, that those claims also occurred pre-petition. Mr. Combs testified very clearly that this occurred in the summer of 2011. He filed his bankruptcy petition in April of 2011. So that goes to the first New Hampshire factor. There was no duty to list these as assets. But if he somehow did have to list his claims as assets, which hadn't even occurred at the time of this bankruptcy petition, his omission of them was not intentional, knowing or in bad faith, as this Court paraphrased in the Total Petroleum case in 1987, that it wasn't tantamount to fraud. He didn't know that he really had these claims against the defendants in the summer of 2011. Obviously he had suffered discrimination. He testified in his deposition that he had talked to some friends who were lawyers, and he really didn't think this was worth it. But at the time, until Glenn Cusimano had blown the whistle on what the Cordish Company and its subsidiaries were doing in 2014, Mr. Combs wouldn't have known what his claims really were at all. So to the extent he even could have had some duty to list them, this wasn't intentional, knowing or in bad faith. And at the very, very least, Your Honors, there would be a genuine dispute of material fact as to this question. It's a question of intent. I mean, that's the paramount sort of factual question that exists in our legal system, which would preclude summary judgment anyway. Now, the other side argues, Cordish specifically, argues that because the district court had discretion to determine whether my client should be judicially stopped, the summary judgment inquiry about what the evidence viewed in the light most favorable to my client's doesn't arise. This Court has never held that. And in fact, other courts specifically have reversed judicial estoppel under like circumstances. That is, specifically, the Stevenson case from the Sixth Circuit in 2012 and the Adjaka case from the Eleventh Circuit in 2006. It's also mentioned in Ocuin in Spain, that if you have this conflicting evidence, the other side says, well, Combs said he knew that there was this claim, but he didn't bring it. But Mr. Combs says very specifically that, you know, I had no idea this was something that I would have to list. This was an incident of discrimination that I, as an African-American, had suffered. And, you know, I had no idea that I had a duty to list this. And of course, the bankruptcy court, in allowing him to reopen and amend his claims, agreed with that. So clearly, this is some sort of genuine dispute of material fact that you can't have summary judgment on. Finally, regardless of any of this, and as I just mentioned, as soon as the Cordish defendants, within a week of the Cordish defendants seeking summary judgment on the basis of judicial estoppel, Mr. Combs successfully reopened the bankruptcy and amended his petition to list these claims. Counsel, what about the merits of the claims? Thank you, Your Honor. I'm happy to get to that. I think two of them have got problems, according to the district court, in tying the claims to the defendants here. Happy to address that. I think as to the merits, this is more of a straightforward, old-fashioned summary judgment appeal. That is, as to all three incidents, viewing the evidence in a light most favorable to my clients, which the district court patently, as we illustrate in our briefs, did not do, my clients met their prima facie burden under the McDonnell-Douglas rubric, and the defendants failed theirs. Recall, of course, that the McDonnell-Douglas rubric is that my clients can prove a prima facie case if they can show either direct evidence of discrimination in these incidents or an ongoing paddle of racially discriminatory animus directly linked to the defendants. Your Honors, I would submit that my clients proved, in spades, viewing the evidence in a light most favorable to them, exactly that. What their evidence showed, from Glenn Cusimano, the former head of security for ECI, for the Cordish Company, for the district, from Garen Williams, one of the longtime guards in the district, Christina Martinez, one of the managers of an establishment in the district, and others, what they showed is that the Cordish defendants, in first response, intentionally and purposefully engaged in a pervasive, years-long racist segregationist scheme, the likes of which we haven't seen in this court in 50 years, to prevent African-Americans from patronizing the live block, using exactly the tactics that were used to exclude the plaintiffs in the three incidents here, under McDonnell-Douglas, under this court's decision in the Kim case in 97, and in the White case in 1998, this is and must be direct evidence of discrimination and, at the very least, an ongoing pattern of racially discriminatory animus. Well, given that, still, you're under 1981, you have to show a contract. For example, in your, however you pronounce it, Tangle Set, the district court said, well, there was no contract, because they hadn't decided where they were going, and when somebody bumped into them, knocked down the cell phone. One thing that I think is interesting is, in holding that, the district court cites no authority. In fact, the only authority is in the bar-restaurant-entertainment context, which, unfortunately, this court has never gotten to apply in 1981 in that context. But I would ask the courts to seriously examine the Dunaway case in the Fifth Circuit, which was a very similar thing, where, well, here, Your Honors have to remember that the live block is one single establishment. It is one large building with its own security control. In fact, on pages four and five of our brief and our statement of facts, we show that, in fact, they serve drinks inside the live block. Cordish itself, or ECI itself, serves drinks inside the live block. So my client's claim isn't just that he was excluded from Tango Set Cantina, but that he was excluded from the live block in total. But I don't think the fact that he hadn't yet made up his mind about, well, it wasn't that he hadn't made up his mind. It was about that he didn't yet know where his friends were. As soon as he found out where his friends were, he would go to that establishment. In fact, they were at Tango Set Cantina, as his friend testified. But Well, that's one. The other is, what evidence do you have that the person who bumped into and knocked it down was doing it at some direction of the defendant? Certainly. It fits the pattern in practice that Glenn Cusimano, Christina Martinez, and Garen Williams and Tom Aleksich all testify to about the pattern in practice that Cordish and its subsidiaries had engaged in using these rabbits. That is, someone comes up to my client, knocks his cell phone out of his hand, and when my client objects, suddenly first responses guards swoop in, accuse him of creating a problem, and eject him from the district. Your Honor, I wanted to reserve three minutes for rebuttal, and I'd like to address these issues then, if that's all right. Okay. Thank you, Your Honors. Okay, Mr. Shenberg. Good morning. Good morning. May it please the Court. Counsel is a zealous advocate, but plaintiffs cannot change the summary judgment record of this case. Kale Hendry's testimony exposed plaintiff's case for what it is, a prosecution based on speculation. Plaintiffs claim that my clients are racially biased by pointing to things they say my clients did to other people. But the plaintiffs cannot get to a jury regarding their own 1981 claims without evidence that defendants did something to them. Pattern in practice is a method of proving bias, usually in employment cases. It doesn't allow a plaintiff to skip the step of proving that the perpetrator is actually the defendant who's in court. In an employment case, that's not usually an issue. But it's clearly an issue here, where there are hundreds, if not thousands, of people walking around the power line district. Plaintiffs' lack of evidence is easiest to see in the Maker's Mark incident. Plaintiffs alleged that an unknown man who started an altercation was a secret agent, a rabbit hired to pick a fight with them because of their race. But plaintiff's speculation was debunked when the man was identified. And the facts he provided contradicted plaintiff's theory of the case. Kale Hendry testified he was no one secret agent. He was just another customer who acted in a bar for his own reasons that night.  And as Judge Riley and Judge Kelly recently confirmed in the Hagen-Miller case, a plaintiff cannot get past summary judgment on the hope that the jury might simply disbelieve the evidence. In the cell phone incident, the man who knocked into Plaintiff Combs was never identified. But there's no evidence that he was any more of a secret agent than Kale Hendry was. The district court did not weigh credibility or evidence. There's no evidence to weigh. No matter how evil Plaintiff Combs might think the defendants are, they cannot be held liable for that. And he cannot get to a jury based only on speculation that they might have been involved. And summary judgment is all the more appropriate here because the facts that Plaintiff Combs described do not even fit the rabbit scheme as his star witness, Glenn Cusumano, described it. As he seems to be describing it here in oral argument, it's bigger than the rabbit scheme. Are you asserting that it's only the rabbit scheme or is it a bigger, I guess, philosophy of discrimination in this? I certainly don't want to testify or speak for what plaintiffs think the scheme is. I don't think there's any scheme whatsoever. Well, how would you describe the evidence that was presented? There's no evidence against my clients as to these plaintiffs. That's my position in this case. And- As to which scheme? As to just the rabbit scheme or a broader scheme? As to any of it. And of course, the district court found as to one defendant, that the doorman at Mosaic created an issue of fact that would have gone to trial but for the judicial estoppel. But short of that, I don't see that there's any evidence of any scheme against, particularly against these plaintiffs, Your Honor. Despite the fact that they have a disgruntled and litigious former employee, Glenn Cusumano, his evidence about this rabbit scheme years later actually points away from the cell phone incident as being part of any such scheme. And the words that Judge Fonstock used when he described Cusumano's, dismissed Cusumano's own race discrimination case, applies equally to Plaintiff Combs' lack of evidence here. Plaintiff testified as to general discriminatory tactics used by defendants, but proffered no evidence of race discrimination directed toward him personally. Furthermore, there's no evidence that Plaintiff Combs, I'm sorry, Judge Riley. I think that the one, to me, that you have the hardest time is the Mosaic Lounge. Tell me why you think that you're entitled to summary judgment on the Mosaic Lounge. Well, Your Honor, we have not appealed the district court's finding that KC Lounge specifically was not entitled to summary judgment. But as to the other defendants, we agree with the district court that there's simply no evidence tying all of them to what one doorman at a restaurant did. The district court repeatedly warned the plaintiffs that they needed to connect the dots among all these different defendants and entities. And the plaintiff repeatedly failed to do so, and they did not do so in their summary judgment opposition. And that's why I believe that the summary judgment granted on that point to the other- Why are the dots not connected by the affidavit? The past person just saying this was a big, I didn't use the word, but conspiracy that they were doing, trying to keep black men out of the facilities. That's the point that Cale Hendry makes is beyond the Maker's Mark incident. It exposes the fact that all of this speculation about what my clients may or may not have done to lots of other people in other circumstances doesn't have anything to do with these plaintiffs. And these plaintiffs are not entitled to a section 1981 remedy unless there's some evidence that my clients are responsible for what happened to them. They cannot say there's a pattern of discrimination. Maybe they could if all they had to do was prove bias. But they have a more fundamental obligation to prove that my clients actually did something to them. Cale Hendry shows that not everything unfortunate that happens to an African American visitor is the result of some scheme. And that's what the district court found as well. In the cell phone incident, Plaintiff Combs is not even engaged in protected activity. A circuit law is clear that just walking into a business is not protected activity. And if walking into- What about this concept, this area is the business, right?  I'm happy to address that. That wasn't the argument on summary judgment. I'm unhappy to address it anyway. Because a circuit law is clear that walking into a business, even a specific business, is not enough to create a tangible attempt to contract and engage in section 1981 protected activity. And if walking into a specific business is not protected activity, then surely standing 30 feet from the front door, just thinking you might walk into one, if your friends are there, is not protected. I want to talk about the judicial estoppel issue as well. At summary judgment, Plaintiff did not dispute the three New Hampshire factors, but rather relied on his claim that his bankruptcy court omissions were an inadvertent mistake. And Plaintiff lost that because he admitted facts supporting the district court's finding that under a circuit law, his failure to disclose was not inadvertent. Moreover, Plaintiff's combs repeated, shifting, and inconsistent explanations in court makes this a case where judicial estoppel is particularly appropriate. Is it your position that he was required to amend in this chapter seven? Well, I want to address that plaintiff's claim that the district court erred because plaintiff was not, he says, legally obligated to disclose the two post-petition incidents. The most obvious problem with the argument is that plaintiff failed to make it at summary judgment. Plaintiff says it's a new argument, and that it's a pure issue of law, and therefore, this court can review it anyway. But that's wrong for four reasons. First, as this court stated recently in In Re, genetically modified rights litigation, this pure error of law argument boils down to plain error review. But plain error doesn't work here, because plaintiff didn't merely forfeit the issue, which is the term used when an issue is raised for the first time on appeal. The first New Hampshire factor and plaintiff's disclosure obligations were raised in the district court. Plaintiff, however, waived the issue by abandoning it twice. And because he abandoned the issue, plain error is not available. He abandoned it initially by failing to address defendant's summary judgment argument that the first New Hampshire factor was satisfied because he had a disclosure obligation. And he conceded the issue again when instead of disputing the obligation, he chose the tactic of telling the district court exactly the opposite. That his failure to disclose the three incidents had been a mistake. Well, let's put that issue aside. Do you think he was obligated to amend? I don't know. I'm not a bankruptcy lawyer. I know this, that the bankruptcy judge, when she, in her belated, or I had a footnote that said, it appears to say that it's an open question in the 10th circuit as to whether or not there was any obligation to amend. I believe that there was here because plaintiff cited the rule about there being sufficiently rooted in the pre-petition asset. Plaintiff wants to pretend there was no pre-petition asset, but of course, as you pointed out, he had a pre-petition claim. And you don't lose the pre-petition claim just by conveniently admitting on appeal an issue that you asserted but lost at summary judgment. He had a pre-petition asset and the latter two claims were intertwined with it. He pleaded them together. He pleaded that they were overall, that they together comprised part of this overall scheme. He pleaded them in one count. He claimed damages for the Maker's Mark incident and said that they were increased each time by the subsequent incidents and his disclosure of damages didn't differentiate among the incidents. Now, plain error also doesn't work because plaintiff's failure extends beyond the district court. His specific legal argument that he didn't need to disclose because of this difference between Chapter 7 and Chapter 13 wasn't raised until his reply brief on appeal. Arguments not made and developed in the opening brief are waived. Third, there is no clear error, as I said, because even the bankruptcy judge says it's an open question, so there's no clear error of law. And fourth, it's not a pure issue of law anyway because we have this sufficiently rooted issue which has two factual determinations that need to be made. Whether it's sufficiently rooted in a pre-petition asset and whether or not it'll entangle the debtor's ability to make a fresh start. Those are both factual determinations, and so it's not a pure error issue. The plaintiff shouldn't be allowed, by the way, to simply pick and choose. Let me ask you this. My knowledge of bankruptcy is somewhat limited, but Chapter 7, which this was, appears, to my knowledge, it deals with a fixed set of assets on a date, certain. Chapters 13, 11, and so on and so forth, they go on going in organization and so forth. But, so why is this not just fixed to what his assets were on the day of the filing of the Chapter 7? He himself is the one who has intertwined them all together and cited this proposition of law that says if the later assets are sufficiently rooted in the pre-petition asset, then they all need to be disclosed. He cites a case that says, well, the evolving value of an asset doesn't need to be disclosed. But that's only if the pre-petition asset itself was disclosed, and here, it wasn't. It's particularly, I think, galling to make an argument about, well, we don't have to disclose because of this distinction between pre-petition assets and post-petition assets, when he didn't disclose the pre-petition asset either. The final point- I mean, the bankruptcy court made a good point, though, didn't it? In the sense that the pre-petition asset is a single incident. And for a lay person to believe that one incident like that would be a claim. I actually don't think that the bankruptcy court made a good point, and I'll tell you why. First of all, the bankruptcy court has a different standard. The bankruptcy court says that they reopen bankruptcies as a matter of course, unless there's a demonstration of bad faith. But the bankruptcy court also amazingly concluded that Plaintiff Combs had no idea, couldn't possibly have had any idea he had a claim. That's exactly the opposite of what he told the district court. He said, I knew I had a claim, I just decided after consulting with attorneys, it would be too hard to pursue it. Cordish was a difficult defendant. That's not not having an idea of having a claim. That's deciding I don't want to bring it, and then changing his mind years later. That's textbook judicial estoppel. I also just want to briefly, if I may, address the last two New Hampshire factors. Plaintiff's entire argument on the last two New Hampshire factors has to do with those being obviated by the reopening of the bankruptcy. But that's directly the opposite of Eighth Circuit law. The Eighth Circuit clearly says that going back and trying to fix it after the fact does not do anything to obviate the New Hampshire factors. Okay, that's in your brief. It is in my brief, your honor. I do want to point out though that- Well, your time's expired. All right, your honor. Thank you. Good morning, Mr. Schwartz. Good morning. May it please the court. I represent first response, a separate defendant in this action. First response is a security contractor that provided security services to the Power and Light District. Only from December of 2010 to October of 2014. First response is not owned by any of the other defendants and has no, is a different defendant altogether. I also want to make clear that Plaintiff Williams has no claim against first response. And Plaintiff Combs is the only plaintiff with claims against first response. Before getting into any of the argument, I want to point out a few misstatements in the reply brief. On page 23, there's a statement to the effect that first response was knowingly complicit in a scheme to exclude African Americans from the district. There is simply no evidence that first response was knowingly complicit in any scheme, let alone whether there was a scheme. In 24 similarly, there's a statement to the effect that there's testimony that first response excluded blacks with knowledge of racist intent. Again, there simply is no evidence of any racist intent on the part of first response. As to the mosaic incident, I think it's really important, it's a threshold question in any case that you identify the proper defendant. And what Plaintiff Combs testified to clear his day in his deposition after very confusing testimony about when this incident occurred at the very end of the deposition after it was back and forth and all over the place, there was a question asked. The best you can tell me as far as when this incident occurred outside of Mosaic, either in line or outside of the line, would have been in 2010 or 2011, is that correct answer? Correct. And so to say that he testified that it was in 2011 is contrary to his later testimony. No, I really don't know when this occurred. Because he can't tell when this occurred, he doesn't know, he can't identify first response. Very briefly, I want to just say about the rabbit scheme, I don't think there's competent evidence that it even existed. But if it did exist, the only evidence is that this was a scheme that was designed to trick first response into ejecting an innocent African American. It doesn't take a grand scheme like this to just have first response eject African Americans. It takes a grand scheme like this to concoct a fight or an incident, a brawl, and then have first response eject both the instigator and then the innocent African American. And by that fact, there's just no way that first response could have known about this. Based on their own evidence, if it is to be agreed, it would be entertained. And just finally, I would like to say that what's really going on here with these contract claims and the difficulties the plaintiffs are having, they're trying to place a square peg in a round hole. The claims here could have been easily brought as a Title II action under the Civil Rights Act of 1964. The EEOC would have swooped in like the SWAT team, done an investigation within a few months of these incidents, the evidence would have been fresher. And we wouldn't have had these issues of them not being able to identify the subjective contract that they actually wanted to engage in. Mere gratuitous presence at a commercial establishment, if a restaurant or a bar is insufficient under 1981, this is not a public accommodations case. I can see my time is up, I apologize. It's been up a long time now. Do you have any questions, Your Honor? No, I think we're okay. No questions. I'd ask that the court affirm the summary judgment. Thank you for indulging me an extra minute or two. Mr. Sternberger, you only have some time, but you wanted three minutes, I'll give you three minutes. That would be very kind, thank you, Your Honor. A couple of things to address here. What Your Honor's just heard when it comes to the facts, when it comes to the merits of this case, utterly, completely fails to view the evidence in a light most favorable to my clients. One of Your Honors asked the other side about this scheme. And Mr. Shainberg responded that he doesn't know, there was no evidence of any such scheme. And he starts talking about something that Judge Fonestock decided. Judge Fonestock, Your Honors are from out of town, is a local Jackson County circuit judge. In another case involving the Cordish defendants, that's not in the record here. It has nothing to do with this case. The evidence here from Mr. Cusimano, who I remind Your Honors was the former head of security for the entire Power and Light District for years, starting in 2009 up through 2012. Testified in great detail and signed affidavits in great detail that Cordish and ECI, his bosses, intentionally devised and ordered all live block establishments to implement a scheme to prevent African American men from patronizing any establishment in the live block. So is your representation that Mr. Cusimano's testimony was not just about the individual establishments that he managed, which I understand was Mosaic and- A couple others, Angel's Rock Bar. Right. But that his testimony extended, he had first hand knowledge of- Most certain. Information given to other managers. Most certain. For example, Tango and- Yes, and Christina Martinez, who was the manager of Maker's Mark, also testified the same thing. But Mr. Cusimano really specifically said that he was ordered by Cordish's own executives to tell blacks that they can't enter a club because they were in violation of the dress code when they were not, just like in the Mosaic incident with Mr. Combs, questioning blacks in a way whites would not be. And when blacks objected, a first response, and he absolutely did testify that first response was complicit in this scheme. Mr. Schwartz's notion that there was no evidence of first response's complicity is utterly without merit. Mr. Cusimano, Mr. Garen Williams, who was a security guard himself in the district, working directly for ECI, who testified about what first response had done. First response's own executive, Lisa O'Brien, who testified finally at the end of her deposition, that she had burned the logs of what they had done, of who they had ejected. Specifically because if people had seen the number of African Americans that they ejected, it wouldn't look good. I call that spoliation of evidence. As to the Tango incident, which Judge Riley, you said you had some issue with, and I don't blame you. The evidence viewed in a light most favorable to my clients isn't that he hadn't made up his mind where to go. Mr. Combs absolutely had. He had a prior appointment with his friend Nicolette, who also testified, her deposition is in the record, cited in our briefs. To go to Tango, he simply stopped to send her a text message to make sure that's where she still was. Under the Dunaway case in the Fifth Circuit, which was about people standing in line to go somewhere, waiting to go somewhere to a club, and also were pretextually excluded from that. And again, this circuit has never addressed exactly this. This is sufficient evidence. This meets McDonnell Douglas. My clients at least should prevail on the merits for summary judgment. A jury should be allowed to hear this. We'd ask the court to reverse. Thank you very much. Thank you, Your Honor. Thank you all for your arguments, both in the briefs and oral argument today, and we'll be back to you in due course. Thank you.